HERCULES CAPITAL, INC.,

     Plaintiff,

v.

DANIEL GITTLEMAN,
DAVID BARCLAY, and
HOWARD A. KWON,

     Defendants.

_____/

## OPINION AND ORDER

### I.   INTRODUCTION

Sometimes at trial the allegations of a complaint fall far short of their promise. It happened here. The accusations of fraud, misrepresentation, and violations of generally accepted accounting principles (GAAP) made against three individual officers of a bankrupt technology start-up turned out to be post-hoc rationalizations for a bad loan. The lender knew the risks of the loans and its own actions and internal documents disprove its claims.

This is an action for fraudulent misrepresentation, negligent misrepresentation, and civil conspiracy brought by Plaintiff Hercules Capital, Inc. ("Hercules") against Defendants Daniel Gittleman ("Gittleman"), David Barclay ("Barclay"), and Howard A. Kwon ("Kwon") (collectively, "Defendants"). Hercules alleges that Defendants, individually and as employees of non-party OpenPeak, a software company, conspired to intentionally or negligently make false misrepresentations to Hercules, a venture debt lender, as to the financial state of OpenPeak and the viability of its products between January and October 2014. Hercules alleges that it relied on these material misrepresentations in deciding to take certain actions with regard to its loan to

OpenPeak. On November 13, 15-17, and 27-29, and December 1, I held a bench trial. Based on the documentary and testimonial evidence presented, I make the following findings of fact and conclusions of law.

## II.    FINDINGS OF FACT

### a. *Hercules Capital, Inc., A Venture Debt Lender*

Plaintiff Hercules Capital, Inc. ("Hercules") is a citizen of Maryland and California, a business development company ("BDC"), and self-described "venture debt lender" that specializes in loans to high-growth, innovative venture-backed companies in the technology and life-science industries. (Henriquez Testimony).

Manuel Henriquez ("Henriquez") is the Chairman and Chief Executive Officer ("CEO") of Hercules. (Henriquez Testimony). Scott Bluestein ("Bluestein") was the Chief Credit Officer ("CCO") and became the Chief Investment Officer ("CIO") of Hercules during the period relevant to this matter. (Bluestein Testimony). April Young ("Young") was the Managing Director for Hercules' Mid-Atlantic Practice, and was responsible for identifying and initially reviewing investment opportunities, including with OpenPeak. (Young Testimony). Mark Roesler ("Roesler") was a Portfolio Credit Manager at Hercules from October 2013 through June or July of 2016. (Roesler Testimony). Mr. Roesler worked on the OpenPeak account from 2013 through 2015. (*Id.*). John Eggbeer ("Eggbeer") was a Principal at Hercules, where he has worked from October 2011 to the present. Mr. Eggbeer worked to source, evaluate, structure, and close venture debt opportunities, and he worked on the OpenPeak account between 2014 and 2016. (Eggbeer Testimony).

Hercules primarily lends money to "development-stage companies" that are not generating revenue and are "burning cash" by consuming working capital as they try to increase sales. (Henriquez Testimony; Young Testimony). When Hercules decides to invest in a

development-stage company, the company is generally 3-5 years away from generating any meaningful revenue, and 4-7 years from generating any meaningful Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA"). (Henriquez Testimony). The typical company that Hercules invests in has been in existence for 2-3 years, and has gone through approximately 2 rounds of capital equity fundraising. (*Id.*). A borrower's historical revenue figures or projected revenues are not Hercules' focus in deciding whether to make a loan or in how Hercules calculates a borrower's value. (Henriquez Testimony; Young Testimony). In order to account for differences in risk among borrowers, Hercules adjusts interest rates and the fee structure of the loan. (Henriquez Testimony). Interest payments and fees are the biggest sources of Hercules' income. (*Id.*). When everything goes well, Hercules' business is lucrative; the loans in this case had interest rates of 12% and the fees were quite high. (*Id.*; Tr. Exs. 5, 6, 168, 180).

The primary thing that Hercules considers when deciding whether to make a loan is the company's enterprise value, which is what the company is projected to be worth over time and what the company could be sold for in the future. (Young Testimony). Hercules prioritizes a company's enterprise value because that is how Hercules gets repaid on its loan. (*Id.*). For repayment, Hercules relies on its borrowers acquiring subsequent infusions of equity or junior debt, or the occurrence of an "exit event," meaning an acquisition by another company or a public offering. (*Id.*; Bluestein Testimony). The vast majority of companies that Hercules invests in are refinanced or acquired. (Young Testimony).

In making or restructuring a loan, Hercules relies on the information included in a "New Deal Request Memorandum" ("New Deal Memo"), an internal Hercules document prepared by the "Deal Team" and "Credit Team" at Hercules for review by the "Investment Committee." (Henriquez Testimony; Bluestein Testimony). The Investment Committee decides to approve or

3

deny a loan based on the information contained in the New Deal Memo. (Henriquez Testimony; Bluestein Testimony). In drafting the New Deal Memo, Hercules conducts due diligence and relies on factual information provided by the borrower. (Bluestein Testimony; Eggbeer Testimony; Henriquez Testimony). Hercules considers information from interviews and representations of management, historical and projected financial information, key investors and partners, and the composition of the borrower's Board of Directors. (Bluestein Testimony; Eggbeer Testimony; Henriquez Testimony). New Deal Memos outline the terms of the proposed loan, give a "background and situation overview" of the company and its financial situation, analyze the potential returns for Hercules, discuss factors in support and risks of the loan, and detail key income statement drivers. (*See* Trial Exhibit 168) (hereinafter, "Tr. Ex."). The memos contain historical and projected financial information provided by the prospective borrower, including the balance sheet and cash flows, which Hercules calls the "Management Case." (*See* Tr. Exs. 168, 180; Young Testimony).

Hercules also calculates its own projections for the financial performance of the borrower, called the "HTGC Case." (*See* Tr. Exs. 168, 180; Young Testimony). The HTGC Case is based on the borrower's financial history and projections, but Hercules "sensitizes" the financial projections to show what the financials of the company would be given "ordinary-course delays." (Eggbeer Testimony). Hercules changes certain assumptions underlying the Management Case and attempts to take into account the borrower's financial track record, ability to accurately project future revenue and growth, the borrower's customers, types of revenue, and factors outside of the company's control. (Eggbeer Testimony). Hercules also considers what will likely happen to the borrower based on its experience with development-stage companies. (Bluestein Testimony).

### b. *OpenPeak, the borrower*

OpenPeak is a now-bankrupt software company. Defendant Daniel J. Gittleman, a citizen of Florida, was the Chairman and CEO of OpenPeak during all times relevant to this dispute. (Gittleman Testimony). Defendant Howard A. Kwon, a citizen of Florida, was Vice President and General Counsel of OpenPeak during all times relevant to this dispute. (Kwon Testimony). Defendant David Barclay, a citizen of Washington, was an Executive Vice President of OpenPeak, and led OpenPeak's finance department beginning in 2013, but did not hold the title of CFO. (Pretrial Stip. at 7).

Other individuals who held roles in OpenPeak's finance department testified at trial. Glen Farmer ("Farmer") was OpenPeak's Finance Director from July 2014 through August 2015. (Farmer Testimony). Mr. Barclay was Mr. Farmer's supervisor. (*Id.*). Mr. Farmer was involved in preparing the financial statements for OpenPeak and in discussions about how to recognize revenue pursuant to OpenPeak's agreements. (*Id.*). Steven Richards ("Richards") was the Vice President of Corporate Development and Finance at OpenPeak and worked there from July 2011 through May 2014. (Richards Testimony). Mr. Richards supervised Brian Hronsky and Trish Pikus, and he reported to Mr. Barclay. Mr. Richards did operational finance at OpenPeak, including managing the books and building financial forecast models. (*Id.*). Brian Hronsky ("Hronsky") was a Controller in the Finance and Accounting Department at OpenPeak from January through June, 2014. (Hronsky Testimony). Mr. Hronsky is a CPA (Certified Public Accountant) and was supervised by Mr. Richards. (*Id.*).

Some OpenPeak officers involved in the technical operations of OpenPeak's software also testified at trial. Lloyd Silvern ("Silvern") worked at OpenPeak from February 2010 until approximately November 2015, and during the relevant time period he was responsible for monitoring the Toggle license provisioning process with AT&T. (Silvern Testimony). Andy

Aiello ("Aiello") was the Chief Operations Officer ("COO") of OpenPeak, and was employed by OpenPeak from 2005 through 2016. (Aiello Testimony). Mr. Aiello was responsible for driving the engineering of OpenPeak's software products, including the software architecture and building, code reviews, and quality testing. (*Id.*). He supervised OpenPeak's software engineers and reported to Mr. Gittleman. (*Id.*).

### i. Hercules' Initial Loan to OpenPeak: 2012 MLSA- the Cisco Tablet

On March 30, 2012, OpenPeak entered into a $15 million secured credit facility with Hercules through a Master Loan and Security Agreement (the "2012 MLSA") with a maturity date of June 30, 2015. (Tr. Ex. 1). The 2012 Senior Term Debt was collateralized by all the assets of OpenPeak, excluding OpenPeak's intellectual property assets but including any proceeds from the sale of any intellectual property assets. (Pretrial Stip. at 5-6).

Under the 2012 MLSA, OpenPeak covenanted, represented and warranted to Hercules (collectively, the "Warranties") that:

> No event has had or would reasonably be expected to have a Material Adverse Effect has occurred and is continuing . . . .

> No information, report, or Advance Request, [or] financial statement . . . furnished by or on behalf of Borrower to Lender . . . contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading at the time such statement was made or deemed made. Additionally, any and all financial or business projections provided by Borrower to Lender were prepared in good faith based upon assumptions to be reasonable at the time . . . .

> [U]naudited interim and year-to-date financial statements as of the end of such month[, quarter, and year] . . . have been prepared in accordance with GAAP . . . .

(Tr. Ex. 1 at 13, 16-17). OpenPeak was also required to provide Hercules with monthly, quarterly, and annual "Compliance Certificates" signed by OpenPeak's CEO or CFO certifying

that OpenPeak's accompanying financial statements complied with the Warranties, including that they were prepared in accordance with Generally Accepted Accounting Principles (GAAP). (Tr. Ex. 1 at 16-17; Young Testimony). "Advance Request" Forms submitted by OpenPeak to Hercules to obtain funds pursuant to the loan agreement also reaffirmed the Warranties. (Pretrial Stip. at 6). Upon receipt of monthly, quarterly, and annual financial statements, Hercules inputted the financial information into its own system, PMR, to monitor and track the financial condition of all of its portfolio companies, including OpenPeak. (Roesler Testimony).

Hercules entered into the 2012 MLSA with OpenPeak in large part due to OpenPeak's strong relationship with Cisco Systems ("Cisco") and development of the CIUS Tablet for Cisco. (Young Testimony; Tr. Ex. 168 at 1). However, within six weeks of loaning the $15 million to OpenPeak, Cisco ended the relationship and cancelled the CIUS Tablet. (Young Testimony; Tr. Ex. 168 at 1). Ms. Young testified that as a result of Cisco's decision to "end-of-life" the CIUS tablet, "the company that [Hercules] had invested in initially was really no longer the company that we had invested in." (Young Testimony). Hercules' other motivations for entering into the 2012 MLSA included Mr. Gittleman's prior business success and the strength of OpenPeak's Board of Directors, which included former Apple CEO John Scully, and other prominent businessmen Mort Topfer and Tom Hill. (Eggbeer Testimony; Bluestein Testimony). Hercules does not contend or allege that there was any wrongdoing in connection with the 2012 MLSA.

### ii. OpenPeak's Business Changes

Until March 2012, OpenPeak's business was to develop and sell end-to-end telecommunications and data services for hardware-based systems. (Pretrial Stip. at 5). After the cancellation of the Cisco tablet, OpenPeak shifted its focus to Advanced Device Application Management ("ADAM") software for mobile telecommunications devices. ADAM incorporated multiple software components that allowed companies to securely permit employees to use their

own mobile devices in the workplace. (Pretrial Stip. at 5). This was called "Bring Your Own Device" ("BYOD") software. (Gittleman Testimony). The ADAM software had three components, including (1) applications that ran on an end-user's mobile device, like an email application, (2) security software for the applications on the mobile device, and (3) a server that had an administrative console and device interface. (Aiello Testimony). Using OpenPeak's software, an individual, or "end user," would be able to use their own mobile phone to download an OpenPeak-created mail application through which they could securely send and receive their work-related email. (*Id.*). OpenPeak was a "white-label" company in that it did not sell its products under its own brand name, but customized its product to its customers' brand and to fit its customers' needs. (Barclay Testimony; Tr. Ex. 26 at 14). OpenPeak's major customers included RIM ("Blackberry") and AT&T. (Tr. Exs. 25, 168, 180).

### iii. OpenPeak's Master Resale Agreement with AT&T

On April 3, 2012, OpenPeak entered into a Master Resale Agreement ("2012 MRA") with AT&T for an ADAM product that AT&T referred to as "Toggle." (Pretrial Stip. at 5; Tr. Ex. 13). Pursuant to the 2012 MRA and subsequent agreements between AT&T and OpenPeak, AT&T would buy permissions or "licenses" from OpenPeak to use the Toggle software. (Aiello Testimony). AT&T distributed some of the Toggle licenses internally, but would primarily sell or otherwise distribute the Toggle licenses to its enterprise customers. (*Id.*). Enterprise customers were typically large companies to which AT&T provided other services. (*Id.*). When AT&T sold Toggle licenses to an enterprise customer, AT&T would make a request for those licenses to be provisioned to that enterprise customer through the Toggle server. (*Id.*). The Toggle server processed Toggle license provisioning requests to AT&T's enterprise customers. (*Id.*). If the process worked as intended, AT&T's order would automatically be sent to the Toggle server, which would then automatically process the request and ensure that the enterprise

customer's administrator had access to the newly provisioned licenses. (*Id.*). In this scenario, OpenPeak played no role in provisioning the licenses. (*Id.*).

If the Toggle server was unable to understand the AT&T order for licenses, OpenPeak would work with AT&T to manually input the order into the Toggle server. (*Id.*). The Toggle software that accepted orders and provisioned licenses was located, at different times, on AT&T's cloud-based offering, Silver Lining, or on Amazon's servers. (*Id.*). Once the enterprise customer had access to the provisioned Toggle licenses, the enterprise customer's administrator could determine exactly which employees, or end users, at the enterprise customer would receive an invitation to use the license. (*Id.*). OpenPeak did not have any control over which employees or "end users" got the Toggle license or whether the end user chose to activate the Toggle license. (*Id.*). An end user who received a Toggle license would then be able to use Toggle applications on their own mobile devices, downloaded from App Stores on Apple, Android, or Blackberry. (*Id.*).

OpenPeak's software products, including ADAM, were subject to rigorous internal testing, including by AT&T. (*Id.*). At one point, AT&T sent Accenture to OpenPeak to assess the rigorousness of OpenPeak's software testing. Accenture rated OpenPeak's testing as a 3.5 on a scale between 1 (worst) to 5 (best), which means that OpenPeak had a reliable, repeatable testing process. (*Id.*). A rating of 2 or 2.5 would be good for a start-up company similar to OpenPeak. (Aiello Testimony). In addition, AT&T did scalability tests of OpenPeak's software at regular intervals, with three or four rounds of scalability testing over a few years. (*Id.*). Mr. Aiello was not aware of any scalability concerns among AT&T's enterprise customers using the Toggle product. (*Id.*). OpenPeak's software consistently passed all of AT&T's scalability tests. (*Id.*).

### c. *The 2012 MLSA Restructuring*

As of Q3 2013, Hercules rated OpenPeak a "3" on its scale for monitoring the credit risks of its loans to borrowers. (Tr. Ex. 161 at 1). The scale assigned a value between 1 and 5 to the credit risk of a borrower, with 5 being the riskiest credit. (Roesler Testimony). A credit rating of "3" meant that OpenPeak was a "watch-rated credit." (Tr. Ex. 161 at 1; Roesler Testimony). The rating also meant that Hercules projected OpenPeak would either need to raise capital or have a liquidity event within three to six months for the company to survive. (Roesler Testimony). Hercules monitored companies with a credit rating of 3 or higher more closely than it did its other portfolio companies with better credit ratings. (*Id.*).

In November 2013, AT&T invested $15 million dollars in OpenPeak. (Gittleman Testimony). As of December 31, 2013, OpenPeak had approximately $10.8 million in cash and receivables. (Pretrial Stip. at 6). At that time, the outstanding balance due to Hercules on the 2012 Senior Term Debt was approximately $9.3 million, not including a $1.125 million end-of-term fee. (*Id.*).

### i. OpenPeak's Interest in Restructuring

At the beginning of 2014, OpenPeak sought to restructure 2012 MLSA to gain additional capital from Hercules, extend the interest-only payment period, and extend the maturity date on the loan. (Bluestein Testimony). It is not uncommon for Hercules to work with a borrowing company to amend, modify, or restructure a loan to give the borrower an opportunity to succeed. (*Id.*).

In advance of the potential restructuring, Mr. Barclay updated Ms. Young and Mr. Eggbeer at Hercules on the status of OpenPeak's products, its relationship with AT&T, actual financial statements for Q4 2013, and financial projections for 2014. (*See* Tr. Exs. 25-27). On January 13, 2014, Mr. Barclay stated in an email to Hercules that OpenPeak's "major partners

have now completed their full launch of the products in late [2013] Q4." (Tr. Ex. 25; Pretrial Stip. at 7). On or before January 20, 2014, Mr. Barclay asked for and received projections from AT&T as to AT&T's forecasted license sales for Toggle in 2014. (Barclay Testimony; Tr. Ex. 283). In an email sent to Mr. Barclay, AT&T projected Toggle license sales of 50,500 in Q1 2014, 221,000 in Q2 2014, 293,500 in Q3 2014, and 297,500 in Q4 2014, for a total of 850,000 projected Toggle license sales in 2014. (Tr. Ex. 283).

On January 22, 2014, Mr. Barclay sent Ms. Young and Mr. Eggbeer an email, attaching a spreadsheet with OpenPeak's revenue forecast for 2014. (Tr. Ex. 26). The spreadsheet represented OpenPeak's projected financial metrics, including license sales and revenue derived therefrom. (Pretrial Stip. at 7-8; Tr. Ex. 26). Mr. Barclay relied on AT&T's projected license sales for 2014 in formulating the financial projections that he sent to Hercules. (Barclay Testimony; Tr. Ex. 283, 26 at 3). OpenPeak's financial projections forecasted that OpenPeak would sell AT&T 861,467 Toggle licenses by the end of 2014. (Tr. Ex. 26 at 3; Barclay Testimony). The January 22 email also attached a PowerPoint presentation which stated that the "AT&T internal sales quota" is "860,000 licenses in 2014." (Tr. Ex. 26 at 15). The PowerPoint also represents that Toggle "[l]aunched in Q4 2014" at AT&T, and that "AT&T has already rolled [Toggle] out to over 40k of 100k targeted internal users." (*Id.*).

Hercules relied on these sales and financial projections in evaluating whether to restructure the 2012 MLSA by including them in its "Management Case" section of the March 2014 New Deal Request Memo ("March 2014 NDRM"). (Eggbeer Testimony; Bluestein Testimony; Tr. Ex. 168; Tr. Ex. 26 at 2-6). These financial statements directly tied OpenPeak's forecast revenue from AT&T Toggle sales to its projected number of Toggle license sales to AT&T. (Pretrial Stip. at 8).

On January 29, 2014, Mr. Barclay emailed Mr. Eggbeer and Ms. Young with "a few more slides" that OpenPeak had been working on. (Tr. Ex. 27 at 1). The attached PowerPoint presentation includes a slide that reiterated OpenPeak's earlier representation that AT&T's Toggle license sales quota was 860,000 licenses for 2014. (Tr. Ex. 27 at 20). The slides also represented to Hercules that beginning February 6th, AT&T would offer Toggle to its customers for free pursuant to AT&T's "Golden Ticket" program. (Tr. Ex. 27 at 19; Eggbeer Testimony). The Golden Ticket method was an AT&T promotion whereby AT&T subsidized Toggle and gave it to customers at no cost in order to promote the sale of other AT&T services. (Gittleman Testimony; Young Testimony). By selling licenses to its enterprise customers, AT&T sought to tighten its relationship with those enterprise customers by providing them with a new service. (Gittleman Testimony; Young Testimony; Eggbeer Testimony).

On February 11, 2014, Mr. Gittleman and Mr. Barclay met with Hercules' CEO Manuel Henriquez, CIO Scott Bluestein, John Eggbeer, and April Young at Hercules' office in Palo Alto, California to discuss a potential restructuring of the 2012 MLSA. (Pretrial Stip. at 8; Tr. Ex. 28, 29). The next day, Mr. Henriquez entered his notes from the meeting into a Hercules database. (Tr. Ex. 29 at 3-4). Mr. Henriquez recounted that Mr. Gittleman and Mr. Barclay "outline[d] their request for Hercules to consider extending both a new interest only period as well as re-upsize additional capital to the company." (*Id.* at 3). Mr. Henriquez also wrote that the "AT&T annual sale quote for new sub[scriptions] is 864,000 at $50/sub which equates to an annual forecast of approximately $43 million in revenues. As incredible as that sounds, this company has yet to deliver on its many prior sales forecasts." (*Id.*). Mr. Henriquez did not rely on Mr. Barclay and Mr. Gittleman's representations and required the Deal Team at Hercules to verify the statements. (Henriquez Testimony). Mr. Henriquez described AT&T's expected sales ramp up of Toggle licenses to 864,000 licenses, which closely tracks the projections that AT&T

12

provided to OpenPeak (Tr. Ex. 283; Barclay Testimony), and the resulting increase in OpenPeak's projected revenue. (Tr. Ex. 29 at 3; Henriquez Testimony; Eggbeer Testimony). Mr. Henriquez noted that Mr. Barclay and Mr. Gittleman expressed interest in a new credit facility from Hercules that included interest-only payment periods and new capital, and that he replied that he would be happy to consider it if OpenPeak demonstrated "traction" with their product. (Tr. Ex. 29 at 4). Mr. Henriquez also stated his belief that despite Mr. Barclay and Mr. Gittleman's rosy projections, (1) OpenPeak would run out of cash by late April or early May, (2) OpenPeak's uncertain outlook depends on gradual increases in license sales, and (3) "the next 60 days are critical for the company." (*Id.*).

Later on February 12, 2014, Mr. Bluestein proposed a deal structure that would require injecting a small amount of additional capital in OpenPeak, but would enable OpenPeak to refinance all its existing obligations under the 2012 MLSA (including the back-end fee), extend OpenPeak's repayment terms, lower its monthly loan payments, and give it the opportunity for interest-only payment periods. (Tr. Ex. 29 at 3; Bluestein Testimony). This proposal provided the general structure of the March 24, 2014 loan restructuring ("2014 ARMLSA"). (Tr. Ex. 5; Bluestein Testimony; *see* Tr. Ex. 168).

### ii. Hercules' Motivations to Restructure

At the same time that Mr. Gittleman and Mr. Barclay were inquiring about restructuring the 2012 MLSA, Hercules was evaluating its borrowers as loan restructuring candidates so that it could generate fee income to raise earnings for its Q1 2014 financial statements. (Henriquez Testimony; Tr. Exs. 166, 167).

On February 14, 2014, Mr. Henriquez sent an email to Mr. Gittleman following up on OpenPeak's request for a new loan, and stating that he has "a strong incentive to make this offer BUT it must close before March 15th, thereafter less interested." (Tr. Ex. 72). Two days later,

Mr. Henriquez sent an email to senior members of Hercules with the subject line: "time to harvest some earnings for Q1 2014 – guys no reason to hide behind the facts, we are in deep crap for Q1 2014 earnings given our new originations and fundings so far in Q1 2014." Mr. Henriquez goes on to mention OpenPeak as a "Major restructuring potential candidate." (Tr. Ex. 166). In the same email, Mr. Henriquez stated that he is "looking for a minimum of $2 to $3 million in fee or interest income by the end of March." Mr. Henriquez continued, "Guys, we can't miss earnings i [sic] need all hands on deck to ensure that we are not going to miss earnings. It will kill what we have all worked so hard to build. Dig through your portfolios, scrub every deal, turn over every rock. . . . So honestly, i [sic] need everyone's help. We need earnings, find some pennies for me please." (*Id.*).

On March 4, 2014, Mr. Henriquez followed-up on his request for major restructuring candidates when he sent an email to Mr. Bluestein and other members of Hercules' senior management with the subject line: "Any updates on the major restructuring or material modifications." In the body of the email, Mr. Henriquez asked "Where are we on . . . Open peak [sic]" and continued "Please send an update and the potential dollars being generated by the restructure." (Tr. Ex. 167 at 5). Jessica Barron, Hercules' Chief Financial Officer, responded to the email and included a chart that listed the amount of income that would be generated from each restructuring deal or material modification, along with the corresponding increase on a per share earnings basis. (*Id.* at 4). OpenPeak was listed on the chart. (*Id.*). The chart stated that a projected OpenPeak restructuring would generate $396,119 in income for Hercules, amounting to an earnings increase of $0.007 per share. (*Id.* at 4).

### iii. March 2014 New Deal Request Memo

In light of both OpenPeak's and Hercules' desire to restructure the 2012 MLSA, Hercules began its internal process for approving the loan restructuring. On March 10, 2014, Hercules and

OpenPeak, through Mr. Kwon, signed a Term Sheet that outlined the essential terms of the restructuring agreement. (Tr. Ex. 4). On March 11, 2014, Mr. Bluestein sent an email to the Hercules Investment Committee, copying other members of the OpenPeak Deal Team at Hercules and attaching the New Deal Memo to restructure the 2012 MLSA ("March 2014 NDRM"). (Tr. Ex. 168). In the email, Mr. Bluestein wrote that the March 2014 NDRM reflects "an effort to get a restructuring / new debt facility in place that makes sense for the Company while at the same time protects and compensates [Hercules] appropriately. . . . [I] am obviously supportive of this proposal." (Tr. Ex. 168 at 1).

Mr. Bluestein outlined a proposal whereby Hercules would commit a new $15 million loan to OpenPeak, divided into two tranches. (Tr. Ex. 168 at 1). In the First Tranche, due upon signing, Hercules would loan OpenPeak $10.5 million that included (1) satisfying all remaining principle and interest due and the $1.125 million back-end fee of the 2012 MLSA, (2) a $200,000 "new facility fee" to Hercules for the new loan, and (3) approximately $518,000 in new capital investment. (*Id.*). The restructured loan would be repaid on a new 36-month term, and contained a financial covenant whereby OpenPeak was required to raise at least $15 million in new equity by the end of May, with at least $5 million coming no later than April, or else there would be an automatic event of default. (*Id.*). The Second Tranche was a $4.5 million loan that would only become available if OpenPeak met certain performance milestones. (*Id.* at 1, 9).

The March 2014 NDRM attached to Mr. Bluestein's email outlined the terms of the proposed restructuring and made several observations regarding the state of OpenPeak. (*Id.* at 3-20). In the Background and Situation Overview section, Hercules recognized that "Since funding, the Company has struggled to grow revenues following the cancellation of the Cisco CIUS tablet." (*Id.* at 3). That section also noted the "significant strain" on OpenPeak's liquidity

from the 2012 MLSA's current amortization rate, and the "encouraging (albeit small) revenues" from OpenPeak's high-profile partners, AT&T and Blackberry. (*Id.* at 3).

The Business Update section of the March 2014 NDRM accurately described the terms of OpenPeak's relationship with AT&T, including that AT&T was responsible for "pushing the Toggle product to end users," and that "OpenPeak expects 50k sub[scription]s in 1Q14 based *on AT&T internal forecasts*. The 2014 *target* [for AT&T Toggle licenses] is 864k." (*Id.* at 6) (emphasis added). Hercules noted that "[r]ecurring license/subscription revenue from existing partnerships will need to materialize" for OpenPeak to succeed, but also pointed out that this "clear risk" to the credit was "present in both the current structure and the new structure." (*Id.* at 6). Hercules also discussed the strength of OpenPeak's partnership with Blackberry, which had "200 enterprises in trial" and "18k paying licensees" while "steadily adding 2.5k subscribers per month since launch in 3Q13." (*Id.*).

In the "Factors in Support" section, the March 2014 NDRM recognized that (1) Hercules would take on "*just 600k in incremental Day 1 principal risk*," and (2) that the affirmative financial covenant requiring $15 million in additional equity by May 31, 2014 "add[ed] protection" for Hercules relative to the existing loan such that it was "specifically designed to alleviate the risk associated with a near-term liquidity issue." (*Id.*). Additionally, Hercules recognized that "revenue traction is very limited at this point" but was optimistic that there would be more revenue traction because AT&T and Blackberry were "actively selling the product to end-users." (*Id.*).

In the "Risks" section, Hercules recognized both that OpenPeak "has shown an inability to perform in accordance with [its] forecasts" and that "[h]istorical revenue from end users is still minimal," with non-recurring engineering ("NRE") revenue constituting "recent revenue of any

significance." (*Id.* at 7). Hercules knew that NRE revenue was typical for a development-stage company like OpenPeak. (Eggbeer Testimony; Bluestein Testimony).

The Management Case section of the Memo incorporated OpenPeak's financial statements and projections provided by Mr. Barclay in the January 22 email. (Tr. Ex. 26; Tr. Ex. 168 at 8-10). The financial statements consisted of OpenPeak's "actual financials through December 31, 2013, with quarterly projections thereafter." (Tr. Ex. 168 at 8, 11). OpenPeak represented that it generated approximately $2.84 million in revenue in 2013, and projected that it would generate $72.93 million in revenue in 2014. (*Id.* at 8). OpenPeak also represented that it lost $22.31 million in 2013, and projected that it would make $31.65 million in 2014. (*Id.* at 9). The "Key Income Statement Drivers" listed included the projected ramp in AT&T Toggle license sales, consistent with what AT&T represented to OpenPeak to be its Toggle license sales target for 2014 (Tr. Ex. 283). (Tr. Ex. 168 at 8). The March 2014 NDRM also noted that "[o]verall AT&T projected revenue constitutes 74.0%" of total 2014 projected revenue, signifying the significance of OpenPeak's relationship with AT&T. (*Id.*).

In the HTGC Case, Hercules changed OpenPeak's assumptions and made its own, more pessimistic projections for OpenPeak in 2014. (Tr. Ex. 168 at 11-13). Hercules projected that OpenPeak would generate $15.68 million in revenue in 2014. (*Id.* at 11). Hercules also projected that OpenPeak would lose $25.56 million dollars in 2014, losing $3 million more than OpenPeak lost in 2013. (*Id.*). In making this projection, Hercules assumed, contrary to OpenPeak's projections, "2Q14 growth of 0% in perpetual licenses (AT&T) and subscription (Blackberry)." (*Id.*). Hercules made these assumptions, which amounted to OpenPeak achieving just 20.2% of projected revenue, because it recognized that "[t]he Company has repeatedly missed targets" and that "the rollout of both of the above partner relationships could be significantly slower than the Company anticipates." (*Id.*). The HTGC Case went on to project

that OpenPeak would generate just 18.0% of projected revenue in 3Q14, 19.4% for 4Q14, and 21.4% for the year. (Tr. Ex. 168 at 11).

### d. *2014 ARMLSA between Hercules and OpenPeak*

On March 24, 2014, Hercules and OpenPeak executed the "Amended and Restated Master Loan and Security Agreement" ("2014 ARMLSA"), wherein Hercules and OpenPeak agreed to restructure the 2012 MLSA, with Hercules committing $15 million in a loan on terms substantially the same as in the term sheet. (Pretrial Stip. at 8; Tr. Exs. 4, 5, 6). The Second Amended and Restated Schedule of Terms and Conditions attached and incorporated the 2014 ARMLSA. (Pretrial Stip. at 8; Tr. Ex. 6). The 2014 ARMLSA contained the Warranties set forth in the 2012 MLSA (Pretrial Stip. at 8) and required OpenPeak to submit Compliance Certificates accompanying financial statements that certified the statements complied with the Warranties (Tr. Ex. 5 § 7.1(d), Ex. E). The agreement also contained a provision in § 7.2 "Management Rights" which permitted Hercules "to inspect the Collateral and examine and make copies and abstracts of the books of account and records" and "to meet with management and officers of Borrower to discuss such books of account and records." (Tr. Ex. 5 at 14).

Upon closing of the 2014 ARMLSA and after receipt of an Advance Request Form from OpenPeak (Tr. Ex. 7), Hercules lent $10.5 million dollars (the "First Tranche") to OpenPeak, at a 12% interest rate. (Tr. Exs. 5, 6, 168). The proceeds of the First Tranche would first go to repaying Hercules all amounts remaining on the 2012 MLSA loan, including principal balance and interest, amounting to approximately $8.6 million. (Tr. Ex. 5 at 7; Tr. Ex. 6, 168). The First Tranche would also pay Hercules the $1.125 million end-of-term fee owed from the 2012 MLSA, and a $200,000 new facility fee. (Tr. Ex. 6, 168). In total, the First Tranche provided OpenPeak with approximately $518,000 in new capital. Mr. Kwon signed the 2014 ARMLSA

and accompanying documents, and the Advance Request that OpenPeak was required to sign before the First Tranche funded. (Tr. Exs. 5, 6, 7).

### e. *Waiver of Financial Covenant in 2014 ARMLSA*

The 2014 ARMLSA contained a new covenant that OpenPeak was required to raise an additional $15 million in new equity by May 31, 2014, raising $5 million of that amount by April 30, 2014. (Tr. Ex. 6 at 4-5). Initially, OpenPeak believed that it would meet this covenant through a $15 million cash investment from Actium Holdings LLC ("Actium"). OpenPeak and Actium signed a Term Sheet on April 25, 2014 that outlined the terms of Actium's investment in OpenPeak. (Tr. Ex. 32 at 2-3). On April 28, 2015, Mr. Barclay forwarded the term sheet to Ms. Young, Mr. Bluestein, and Mr. Eggbeer and represented to them that OpenPeak was on track to sign the final documents on May 5 and close the full funding by May 9. (Tr. Ex. 32 at 1).

Just a few days later, barely one month after Hercules and OpenPeak entered into the 2014 ARMLSA, OpenPeak was on the verge of an automatic event of default because Actium decided not to invest all $15 million in OpenPeak. (Tr. Ex. 6 at 4-5; Tr. Ex. 174). Actium reduced its commitment to $5 million. (Tr. Ex. 174 at 2). Despite the fact that Hercules required this financial covenant explicitly to "alleviate the risk [to Hercules] associated with a near-term liquidity issue," Hercules still decided to waive the covenant. (Tr. Ex. 8). To accommodate OpenPeak and avoid an automatic event of default on the 2014 ARMLSA, Hercules agreed to the First Amendment and Wavier of the 2014 ARMLSA ("First Waiver"). (Tr. Ex. 8). The First Waiver included a revised financial covenant which required OpenPeak to raise at least $7 million in new equity by May 12, 2014, and an additional $8 million "in cash proceeds from the sale and issuance of its equity securities and/or upfront license revenue." (*Id.* at 2). In return for these concessions, Hercules cancelled a 3-month interest-only period that OpenPeak had earned based on 1Q14 performance. (Tr. Ex. 8). Hercules' decision to modify the covenant on those

terms was not "a shot in the dark that the company might come up with a prepay," but Hercules knew "that a negotiation was underway with AT&T to secure that payment and that financing." (Eggbeer Testimony).

In the Second Amendment and Waiver of the 2014 AMRLSA ("Second Waiver"), executed at the same time, Hercules and OpenPeak agreed that Hercules could loan OpenPeak additional advances, including the $4.5 million Second Tranche, regardless of whether OpenPeak reached certain financial milestones in the 2014 AMRLSA. (Tr. Ex. 9). Hercules collected additional fees from Hercules as consideration. (*Id.*). Mr. Kwon signed both Waivers. (Tr. Exs. 8, 9). Mr. Kwon signed the Compliance Certificate accompanying the April 2014 financial statements. (Tr. Ex. 36 at 2). All subsequent Compliance Certificates transmitted to Hercules certifying the financial statements were signed by Mr. Barclay. (*See* Tr. Ex. 37 at 2; Tr. Ex. 38 at 2; Tr. Ex. 39 at 5; Tr. Ex. 42 at 5; Tr. Ex. 50 at 5)

### f. *Amendment 6 – The AT&T Non-Refundable Prepayment*

On July 22, 2014, OpenPeak and AT&T executed Amendment 6 to the 2012 MRA with AT&T. (Tr. Ex. 18). In relevant part, Amendment 6 applied different terms and conditions to three sets of Toggle licenses sold to AT&T. (*Id.*; Barclay Testimony; Gittleman Testimony). First, AT&T would not be required to pay any perpetual licensing fees on the 100,000 licenses that OpenPeak granted to AT&T for internal use in Amendment No. 4. (Tr. Ex. 18 at 3). Next, AT&T agreed to pay OpenPeak "$8 million for 225,000 nonrefundable AT&T Toggle perpetual licenses." (*Id.* at 3). The $8 million would be paid in two installments, but in no event later than July 25, 2014. (*Id.*). OpenPeak agreed to "deliver the 225,000 fully paid-up perpetual licenses to AT&T per the following schedule: 50,000 in July 2014; 55,000 in August 2014; 60,000 in September 2014; and 60,000 in October 2014." (*Id.* at 3-4). Lastly, Amendment 6 detailed the "[f]ees for *additional* perpetual licenses" beyond the 225,000 for which AT&T prepaid. (*Id.* at

4) (emphasis added). Those "[l]icense fees will be billed for 'active users,' defined as follows: Prior to January 1, 2015, AT&T will pay perpetual license and maintenance fees for Installed Users of the applicable software. An 'Installed User' is an End User that has installed AT&T Toggle on at least one device that has been registered on an AT&T Toggle Server." (Tr. Ex. 18 at 4).

Hercules' claim of GAAP non-compliance primarily revolves around the methodology of reporting the revenue derived from the AT&T prepayment. Each month between July and October, 2014, OpenPeak recognized as revenue a portion of the $8 million nonrefundable payment that corresponded to the number of licenses that OpenPeak delivered to AT&T as part of Amendment 6's license delivery schedule. (Farmer Testimony; Barclay Testimony). With respect to the Amendment 6 nonrefundable license sale to AT&T, OpenPeak decided to recognize revenue in this manner in part based on consultations it had with its independent auditing firm, Mayer Hoffman McCann ("MHM"). (Barclay Testimony; Tr. Exs. 224, 227). When OpenPeak and AT&T were drafting Amendment 6, Mr. Barclay sought unofficial guidance from Jeremy Ahwee and Michael Pecchia of MHM as early as May 30, 2014, for their thoughts on how OpenPeak should recognize revenue from AT&T's $8 million payment. (Barclay Testimony; Tr. Exs. 224, 227).

Jeremy Ahwee, a CPA, was a director and shareholder with MHM who was responsible for conducting an independent audit of OpenPeak for FY 2012 and 2013. (Ahwee Testimony). MHM, Mr. Ahwee, and Mr. Pecchia were not contracted by OpenPeak to determine how OpenPeak should recognize the revenue from Amendment 6, but provided unofficial guidance as part of their ongoing relationship with OpenPeak. (Id.).

On June 25, 2014, Mr. Barclay emailed Mr. Ahwee and Mr. Pecchia a draft of Amendment 6 and asked for their thoughts on revenue recognition because he wanted "to make

sure we are structuring it correctly to recognize the upfront revenue per the schedule." (Tr. Ex. 227 at 4). Mr. Ahwee asked Mr. Barclay a series of questions designed to get a better understanding of Amendment 6 and suggested adding language that the perpetual licensing fee was "non-refundable." (*Id.* at 3). Mr. Barclay acknowledged Mr. Ahwee's suggestion and "included nonrefundable language" in Amendment 6. (Tr. Ex. 228 at 2). After Mr. Barclay asked for final comments from Mr. Ahwee on the draft of Amendment 6, Mr. Ahwee laid out his assumptions, stated that he "did not note any other item" in Amendment 6, and that one of the "main items" was "the non-refundable perpetual licensing fee and the removal of any outs (such as any acceptance clauses relative to the Toggle licenses)." (*Id.* at 1). Mr. Ahwee concluded "if the contract stipulates the above items, as intended, we believe that the Company would be able to meet the revenue recognition criteria." (*Id.*). Mr. Barclay also viewed "§ 985-605, Software – Revenue Recognition," the AICPA revenue recognition standard applicable to the Amendment 6 Toggle license sale, in an effort to ensure OpenPeak's revenue recognition was GAAP-compliant. (Tr. Ex. 235 at 2).

### g. *OpenPeak Revenue, June 2014*

On June 23, 2014, Mr. Barclay sent Mr. Eggbeer an email, attaching OpenPeak's May 2014 financial statements, and representing that "we are wrapping up the AT&T deal this week so we should touch base after that. June is shaping up to be our best month ever!" (Tr. Ex. 37 at 1). Mr. Barclay signed the attached Compliance Certificate for the May 2014 financial statements certifying their compliance with the Warranties. (Tr. Ex. 37 at 2).

On July 30, 2014, Mr. Barclay sent an email to Mr. Eggbeer, copying Mr. Bluestein and Ms. Young, forwarding OpenPeak's June and Q2 2014 certified financials. (Tr. Ex. 38). Mr. Barclay stated that "we had a great Q2 (and especially June) that was nearly double our revenue in Q1. Even more exciting, we closed the AT&T deal, including $8M of additional funding in

July." (*Id.*). The accompanying financial statement represented that OpenPeak generated $2,377,306 in license sales revenue in June 2014, and $4,097,270 for Q2 2014. (*Id.* at 4). Mr. Barclay signed the Compliance Certificate attached to the email certifying that the Q2 2014 and June 2014 financials complied with the Warranties. (Tr. Ex. 38 at 2).

A dispute arose between AT&T and OpenPeak about whether the Amendment 6 prepayment covered Toggle licenses AT&T purchased in June 2014. On August 1, 2014, AT&T emailed Chris Hill, President of OpenPeak, writing "need the june [sic] licenses settled in the new model." (Tr. Ex. 300 at 1). On August 4, 2014, Hill disputed that AT&T's purchase of Toggle licenses in June was covered by Amendment 6, noting: "All throughout the last two plus months of trying to get the new agreement closed, I am not aware of a single conversation at any level or at any time that set the expectation that the agreement would need to be retroactive, nor does the final agreement support retroactive application. . . . The pre-paid license allocation [in Amendment 6] is clearly set forth in the agreement running from July thru Oct." (*Id.* at 1).

Since OpenPeak believed that Amendment 6 did not cover any June 2014 Toggle license purchases, on August 5, 2014, Mr. Farmer sent an email to AT&T, copying Mr. Barclay and Mr. Silvern, and attaching an invoice for June licenses for AT&T's "review and payment." (Tr. Ex. 302 at 2). On August 6, 2014, AT&T replied, stating: "In light of the agreement on June settlement between OpenPeak and AT&T I have sent the June settlement report to [Mr. Silvern]. There are no additional licenses to be purchased at this time. Please withdraw your invoice and resubmit with the maintenance fees only." (*Id.* at 2). Mr. Barclay responded later that day, stating that "[t]here has been no agreement on the June settlement that would change our invoice. We will not be withdrawing our invoice at this time." (*Id.*).

That same day, AT&T emailed Mr. Silvern stating: "AT&T and OpenPeak have agreed to use the first installment of 50k licenses purchased as part of Amendment 6 to apply to the June

EOM demand. . . . The additional 50k licenses increases our acquired license pool to 57,747 and covers the 47,951 licenses in effect as of June 30. No additional licenses need to be purchased at this time." (*Id.* at 1). In response, Mr. Barclay wrote: "We have not agreed to apply any of the licenses in Amendment 6 to the June demand. Thank you for finally providing the June report but you can expect that we will be submitting a dispute letter tomorrow." (Tr. Ex. 302 at 1).

The evidence indicates that AT&T did not dispute how many licenses it purchased in June, but rather whether it was required to pay for those licenses in light of Amendment 6's $8 million payment for 225,000 Toggle licenses. Mr. Gittleman and Mr. Barclay testified that AT&T owed OpenPeak money from AT&T's license purchases in June 2014, and that after the parties agreed to Amendment 6 on July 22, AT&T wanted OpenPeak to lump those licenses in with the licenses purchased for $8 million so that AT&T did not have to pay OpenPeak additional money. (Gittleman Testimony; Barclay Testimony). When OpenPeak invoiced AT&T, OpenPeak reasonably believed that it was due to be paid for the licenses that AT&T purchased in June, and AT&T did not dispute that they purchased those licenses. (Barclay Testimony; Farmer Testimony).

Mr. Eggbeer claimed that if he had known at the time that OpenPeak's June revenue numbers were incorrect, Hercules would have exercised the deposit account control agreements under the 2014 ARMLSA, "swept" the $7 million in cash that OpenPeak had in its accounts, and "moved to monetize the remaining assets to recover" as much as Hercules could beyond the cash. (Eggbeer Testimony). However, I am not persuaded that OpenPeak acted in bad faith or violated GAAP in its recognition of revenue from June 2014 license sales. The evidence shows that AT&T did not dispute how many licenses it purchased in June 2014 and that OpenPeak recognized revenue from the sale of those licenses in the same way it had in previous months.

Mr. Barclay reasonably believed that Amendment 6 did not include licenses purchased in June 2014.

### h. *OpenPeak Revenue, July – September 2014*

On August 28, 2014, Mr. Barclay emailed OpenPeak's financials for July 2014 to Hercules, along with the Compliance Certificate signed by Mr. Barclay. (Tr. Ex. 99 at 6). Mr. Barclay wrote, "[w]e had another great month with $2M of revenue that was in line with our forecast." (*Id.* at 1). The financial statements represented that OpenPeak had earned $1,983,369 in revenue in July. (*Id.* at 3). Mr. Barclay also wrote that "August is shaping up to be our best month ever based on some of the deals we know have closed already." (Tr. Ex. 99).

Mr. Barclay sent an email to Mr. Eggbeer, copying Mr. Bluestein and Ms. Young, on September 18, 2014, in which he stated: "We had an AWESOME month with $3.5M of revenue and $800K of EBITDA! Both AT&T and BlackBerry have both been executing really well. . . ." (Tr. Ex. 42 at 1). The email attached OpenPeak's August 2014 financials and a Compliance Certificate signed by Mr. Barclay (*Id.* at 5) that represented to Hercules that OpenPeak had earned $3,460,205 in revenue in August (*Id.* at 2). Mr. Eggbeer testified that Mr. Barclay and Mr. Gittleman represented to him that the August 2014 revenue figure was the result of license sales. (Eggbeer Testimony). This representation was accurate, as the revenue recognized in August 2014 was derived, in part, from OpenPeak's delivery of Toggle licenses to AT&T pursuant to Amendment 6, and OpenPeak's corresponding revenue recognition. (Barclay Testimony; Farmer Testimony). OpenPeak's revenue statements from July, September, and October were also the result of license sales because they were derived, in part, from recognizing revenue from AT&T's $8 million payment corresponding to the delivery of Toggle licenses. (*Id.*).

### i. *Discussions About Second Tranche Loan*

#### i. October 2014 Meeting

Beginning in late September 2014, Mr. Gittleman and Mr. Barclay reached out to Hercules about the potential to draw down on the $4.5 million Second Tranche in the 2014 ARMLSA. (*See* Tr. Ex. 43). On September 30, 2014, Mr. Gittleman wrote an email to Mr. Henriquez stating: "We've really been crushing it lately, revenue has been growing through the roof and we'll have over $1.5M EBITDA in September." (*Id.*). In the email, Mr. Gittleman inquired whether Mr. Henriquez was available to meet in early October. (*Id.*).

On October 9, 2014, Mr. Gittleman and Mr. Barclay met with Mr. Henriquez in Palo Alto, California to discuss the possibility of drawing down on the Second Tranche. (Tr. Exs. 45, 46; Gittleman Testimony; Henriquez Testimony). During the meeting, Mr. Gittleman, Mr. Henriquez and Mr. Barclay discussed OpenPeak's financial performance and its relationship with AT&T. (Tr. Ex. 46; Henriquez Testimony).

In an email to senior members of Hercules involved with OpenPeak, Mr. Henriquez recounted the meeting. (Tr. Ex. 46). Mr. Henriquez wrote: "Fully recognizing that Dan is the constant salesman, but also seeing that he is a man with passion and religion to what he is attempting to accomplish, things are materially improved at the company." (*Id.* at 1). With regard to AT&T, Mr. Henriquez wrote that Mr. Gittleman represented that AT&T was "selling over 200,000 [Toggle licenses] per month" but that "when [he] pressed [Mr. Gittleman] as to how [many] of those licenses have been turned on the number was dramatically lower." (*Id.*). Henriquez continued, stating that Mr. Gittleman represented that OpenPeak "recently issued a self install to make the feature easier to enable" which Mr. Gittleman believed would "dramatically increase the number of users." (*Id.*). Hercules was aware of the "dramatically" low activations of AT&T Toggle licenses by October 9, at the latest. Mr. Henriquez also said

that he observed the new applications "up and running and more importantly i [sic] witness[ed] what a new user would experience on enabling the OpenPeak solution which was amazing." (*Id.*).

Mr. Henriquez also wrote that Mr. Gittleman stated he anticipated OpenPeak would be "receiving expressions of interest to be acquired," and that in advance of such activity, OpenPeak wanted to bolster its liquidity "by $3-$5 million" and would prefer to do that in the form of "debt financing." (*Id.* at 2; Henriquez Testimony). Mr. Henriquez concluded that "the company has demonstrably made advances that i [sic] was not expecting to see" and that "we should follow up and things appears [sic] to be progressing quite well, which would all need to be confirmed and evidence supporting these claims validated." (*Id.*).

### ii. October 14 Email: Toggle Licenses and Activations

On October 14, 2014, Mr. Barclay sent Mr. Eggbeer and Ms. Young an email containing, among other things, OpenPeak's financial statements for the month of September 2014. (Tr. Ex. 47). In the email, Mr. Barclay stated: "Our September Revenue was $4.4M and EBITDA was $1.6M based on continued strong performance from AT&T and BlackBerry. . . . Overall Q3 was a fantastic quarter for Open Peak with 165K licenses sold to AT&T and 155K licenses sold to BlackBerry." (Tr. Ex. 47 at 1). The accompanying financial statement for OpenPeak represented to Hercules that OpenPeak generated $4,411,232 in revenue for September 2014. (*Id.* at 3). The email also made certain representations as to "AT&T Q3 Sales" and attached a report from AT&T that listed the total number of licenses provisioned to each AT&T enterprise customer, and the total number of provisioned licenses that were "in use." (*Id.* at 7-10). Mr. Barclay wrote that the attachment "shows AT&T sales of 415K licenses in Q3, far more than the 165K licenses Open Peak [sic] recognized as revenue. The [remaining] 250K licenses (415 - 165 = 250) *will be recognized as they are activated in Q4*." (*Id.* at 1) (emphasis added).

Consistent with Mr. Barclay's representations in the email, the attached AT&T Q3 Sales Report listed 413,252 licenses provisioned by AT&T to its enterprise customers, with just 335 of those licenses "in use." (*Id.* at 7-10). Mr. Barclay's email and attachments confirmed to Hercules that (1) the revenue numbers Mr. Barclay had reported in July through September were not based on activations of the licenses that OpenPeak sold to AT&T under Amendment 6, and (2) OpenPeak would recognize revenue from the sale of any additional licenses to AT&T when those licenses were activated. (*Id.*).

Mr. Barclay's October 14 email also made representations as to the "AT&T Q4 Pipeline" and attached a report with more detail. (Tr. Ex. 47). Mr. Barclay represented that "AT&T has over 2M licenses to 225 different enterprise accounts (see chart on left side of first page)." (Tr. Ex. 47 at 1). The attached report listed a "grand total" of 233 enterprise accounts at AT&T for which Toggle licenses had been approved through the Golden Ticket program, amounting to a pipeline of 2,087,763 Toggle licenses. (*Id.*). These AT&T documents represented to Mr. Barclay and Hercules that AT&T had a strong sales pipeline for Toggle, even though few end users had activated Toggle at that point.

### iii.  October 15 AT&T Settlement Re: June 2014 License Dispute

On October 15, 2014, OpenPeak and AT&T entered into a "Settlement Agreement and Mutual Release" ("AT&T Settlement") that stated in part:

> For purposes of clarification going forward (post-June 2014): Payment for perpetual licenses fees beyond 225,000 new net active users will be paid according to Amendment 6. No perpetual license fees will be due from AT&T during the period July 2014 to December 2014 unless AT&T provisions more than the 225,000 net new licenses to Active Users.

(Tr. Ex. 19 at 1-2). This provision meant that before AT&T paid OpenPeak perpetual license fees for Toggle licenses sold in excess of the 225,000 prepaid licenses in Amendment 6, at least 225,000 end users would have to activate their Toggle licenses. (Barclay Testimony).

The AT&T Settlement also resolved the dispute between AT&T and OpenPeak about whether the Toggle licenses AT&T purchased in June 2014 were included in Amendment 6, and whether AT&T was required to separately pay OpenPeak for those licenses. (Tr. Ex. 19 at 1; Tr. Ex. 117). As the significantly larger company with greater leverage, AT&T had the power to dictate its relationship with OpenPeak. (Gittleman Testimony; Barclay Testimony). The AT&T Settlement agreement resulted in OpenPeak not being able to recognize revenue in June 2014 from the licenses that AT&T bought during that month. (*Id.*).

### iv.  October 17 Email: OpenPeak Financial Statements and Projections

Two days later, on October 17, 2014, Mr. Barclay emailed Mr. Eggbeer and Ms. Young, attaching OpenPeak's actual financial statements from January through September 2014. (Tr. Ex. 48 at 4). Instead of listing the same $2,377,306 in revenue for June 2014 that OpenPeak had reported on July 30, 2014 (Tr. Ex. 38 at 3), June 2014 revenue was listed as just $122,564, all coming from license support and maintenance fees. (Tr. Ex. 48 at 4, 6). Mr. Barclay testified that OpenPeak restated its June 2014 revenue as a result of the AT&T Settlement entered on October 15, 2014. (Barclay Testimony). Mr. Eggbeer testified that he and Mr. Barclay spoke about OpenPeak's June 2014 revenue restatement, which affected OpenPeak's Q2 2014 revenue, around the time that Mr. Barclay sent Mr. Eggbeer the actual Q3 2014 financials on October 17, and that he was satisfied with Mr. Barclay's explanation for the restatement. (Eggbeer Testimony; Barclay Testimony; Tr. Ex. 117 at 1). Hercules was aware of the restated June 2014 revenue numbers by October 17, before Hercules decided to make the Second Tranche loan. (Tr. Ex. 48 at 4, 6).

The financial statements contained detailed financial information about the type of revenue generated from AT&T, including whether the revenue was derived from NRE, perpetual license fees, or support and maintenance fees, and gave projected financials and license sales for

October 2014 through December 2015. (Tr. Ex. 48 at 4). The spreadsheet represented that: (1) cumulative AT&T license sales from July through October 2014 directly track the license delivery schedule in Amendment 6 and the revenue recognized upon delivery thereof; and (2) OpenPeak projected sales of 100,000 Toggle licenses in November 2014, corresponding to $2.8 million in revenue, and sales of 150,000 Toggle licenses in December 2014, corresponding to $5.5 million in revenue. (Tr. Ex. 48 at 4).

### v. October 21 Email: "Crossover" from Amendment 6 Prepayment

On October 21, 2014, Mr. Eggbeer asked Mr. Barclay in an email "when the crossover on the AT&T prepay [was] projected to happen." (Tr. Ex. 49 at 1). Mr. Barclay responded "[e]nd of this month." (*Id.*). Mr. Eggbeer followed up, asking Mr. Barclay whether "the license counts in the forecast [had] been updated to reflect actual licenses through September 2014," and Mr. Barclay responded, "Yes." (*Id.*; Barclay Testimony; Eggbeer Testimony).

Mr. Eggbeer assumed that this "crossover" meant that OpenPeak had "sold through" the 225,000 licenses that were the subject of the $8 million prepay sale to AT&T. (Eggbeer Testimony). Mr. Eggbeer believed that by the end of October, OpenPeak would have delivered all of the 225,000 Toggle licenses to AT&T and would have recognized all of the $8 million as revenue, and that OpenPeak was now moving to a "pay as you go relationship" with AT&T, with OpenPeak "generating additional operating cash flow." (*Id.*).

Mr. Eggbeer testified that Mr. Barclay told him that the low activation issue was primarily technical in nature, and that OpenPeak was working on a fix that would enable end users to self-install the software. (*Id.*). This testimony was consistent with Mr. Henriquez's contemporaneous notes of his meeting with Mr. Gittleman and Mr. Barclay. (Tr. Ex. 46). As early as January 2014, Mr. Barclay represented to Hercules that OpenPeak was working on making the activation process easier for end users. (Tr. Ex. 27 at 22). Hercules did not provide

evidence to show that OpenPeak did not release a "self install" or was not working on a technical solution to enable easier activation. The representations of Mr. Barclay and Mr. Gittleman regarding technical solutions to the low Toggle license activations did not change the fact that Hercules was aware that OpenPeak did not control Toggle license activation, that an end user had to decide to activate the license, and that activation by end users was low.

### j. *October 2014 New Deal Request Memo*

On October 23, 2014, Ms. Young and Mr. Eggbeer published another New Deal Memo for the $4.5 million Second Tranche ("Oct 2014 NDRM"). (Tr. Ex. 180). The Oct 2014 NDRM outlined the terms of the Second Tranche and made several observations as to the state of OpenPeak. (Tr. Ex. 180). As with all loans and restructurings, Hercules relied on the Oct 2014 NDRM in deciding to give the Second Tranche to OpenPeak. (Eggbeer Testimony; Bluestein Testimony). A critical factor in Hercules' decision to loan OpenPeak the Second Tranche was that OpenPeak was likely to be acquired within the next six months, thereby resulting in Hercules being repaid in full on its loan. (*See* Tr. Ex. 180). At the time the Oct 2014 NDRM was prepared, and consistent with Mr. Gittleman and Mr. Barclay's representations to Mr. Henriquez at the October 9 meeting, OpenPeak was receiving expressions of interest about being acquired. (Tr. Ex. 46; Henriquez Testimony)

In the "Background and Situation Overview" section, the Oct 2014 NDRM details the relevant facts regarding OpenPeak's request for the Second Tranche. (Tr. Ex. 180 at 1-2). The Memo noted the ramp in revenue from Q1 through Q3 2014 and the "significant backlog of 4Q14 sales," which "culminated in the receipt of two inbound LOIs." (*Id.* at 1). An "inbound LOI" was an unsolicited Letter of Intent to acquire OpenPeak. (Eggbeer Testimony). The LOI that was "credible enough to pursue" came from Synchronoss, a $1.8 billion market cap public company that valued OpenPeak at $300 million. (Tr. Ex. 180 at 1). The Memo noted that the

OpenPeak Board of Directors "approved moving forward with final negotiations" to be acquired and that Hercules reviewed Synchronoss' LOI to acquire OpenPeak and "confirm[ed] its authenticity." (*Id.*). Hercules was aware that OpenPeak's 3Q 2014 revenues "were credited against the AT&T prepay" and that OpenPeak had "not collected customer payments in several months." (*Id.*). This representation underscores the fact that Hercules was aware that the revenue OpenPeak recognized in Q3 2014, from July through September, was derived from AT&T's $8 million prepayment pursuant to Amendment 6. In light of Mr. Barclay's October 14 email which included the low number of activations of Toggle licenses among AT&T's enterprise customers, Hercules knew that OpenPeak's recognition of the Q3 2014 revenue was not tied to Toggle activations. (*See* Tr. Ex. 47 at 7-10). The "Background and Situation Overview" section concludes:

> The Company will need a minimum of $3.0 million in new capital to reach 1Q15, at which time collections from 4Q14 will start to hit the balance sheet. Management wants to solidify the balance sheet in anticipation of negotiating a definitive agreement. They have asked us to consider funding $4.5 million to bridge the Company through the sales process and into cash flow positive operations in 1Q15. The Deal Team views this as short term capital, and it is priced accordingly.

(Tr. Ex. 180 at 1).

The three potential repayment scenarios listed in the Return Analysis section all envisioned OpenPeak being acquired or some other "exit event." (Tr. Ex. 180 at 3). Hercules believed that the "most likely scenario" was "that the Company will enter a definitive agreement to be acquired within the next six months" "[g]iven the activity around the incoming LOIs, and the board's receptiveness to the opening terms." (*Id.*). Nowhere in Hercules' return scenarios is there any mention of OpenPeak's historical or projected revenue as a factor in Hercules being repaid.

In the "Business Update" section, Hercules represented that it understood OpenPeak was close to "crossover" from Amendment 6's prepayment and "will soon revert to pay-as-you-go at the original price." (*Id.* at 4). The Memo went on to say that "AT&T has sold through 413,000 licenses of which just 182,000 have been recognized. The remaining ~230,000 sold licenses will be recognized in 4Q14 with crossover on the prepayment agreement occurring at the end of October 2014. . . . Further, AT&T has a 4Q14 pipeline of more than 2,000,000 licenses." (*Id.* at 4). Hercules concluded the section by noting that "[a]s has happened with past budgets," OpenPeak had not met the relevant revenue targets that would have allowed it to draw down on the $4.5 million Second Tranche. (Tr. Ex. 180 at 4). Despite this, Hercules wrote that the Deal Team and Mr. Bluestein "believ[ed] the Company [had] turned a corner" and that progress with its resale partnerships "along with the Enterprise Value data point of the LOI leaves us comfortable that an increased exposure would be well protected." (*Id.*).

In the "Factors in Support" section, Hercules did not rely on any specific revenue projections from OpenPeak's relationship with Hercules, but instead is focused on the "enterprise value" of the company. (*Id.* at 4-5). First, Hercules noted that AT&T's $8 million prepayment "for the right to give the software away to its end users" "constitutes a significant demonstration of [OpenPeak's] underlying value." (*Id.* at 4). Hercules also wrote that "[t]raction from AT&T . . . has arrived and examination of the backlog suggests that it will continue into 2015." (Tr. Ex. 180 at 4). However, although Hercules believed there was traction with AT&T license sales, Hercules knew about the low levels of Toggle license activations. Hercules noted the low activations as a "Risk" in the next section of the 2014 Oct NDRM when it wrote that "[w]hile the continued sales from AT&T tell a compelling story, very few end users have activated the service . . . should it continue in perpetuity, AT&T will eventually have to respond." (Tr. Ex. 180 at 5). Hercules knew that "AT&T at some point would become

concerned if th[e] [low activation] challenge remained." (Eggbeer Testimony). Hercules was aware of the risk that AT&T would stop paying OpenPeak for a product that their enterprise customers were not actually using. (Eggbeer Testimony). In addition, Hercules wrote in the Oct 2014 NDRM that "The Deal Team is comfortable with [the low end user activation] scenario" for the "primary reason" that "AT&T has used the activation team as a profit center, often charging $1,000 or more to turn on the software." (Tr. Ex. 180 at 5). Hercules also justified this risk based on its belief that license activations at AT&T would follow the same trend as the rapid license activations at Blackberry once OpenPeak released a self install for the software. (*Id.*). Hercules was aware of the low activations and attendant risks, but hoped that AT&T would replicate the success that OpenPeak had with Blackberry in activating licenses through a self install patch.

The second "Factor in Support" reiterated Hercules' focus on OpenPeak being sold as a motivating factor for the Second Tranche, noting that OpenPeak had "entered a sale process and [had] already received two offers at more than 21x the proposed [Hercules] exposure." (*Id.*). The second "Factor in Support" further noted: "There is a reasonable likelihood that the Company will enter a definitive agreement in the short term . . . ." (*Id.*). As is the case throughout the Oct 2014 NDRM, Hercules believed that OpenPeak would be acquired in the "short term" and relied on that belief in deciding to give OpenPeak the Second Tranche. The final "Factor in Support" indicated that in deciding to loan OpenPeak the Second Tranche, Hercules was not as concerned with OpenPeak's revenue projections as it was with OpenPeak's "ability to raise significant equity." (*Id.*).

In the "Risks" section, Hercules noted that it "has been down this path with OpenPeak before" regarding an earlier potential sale of the company where the "process extended well beyond initial management estimates and was eventually abandoned after the board concluded

that the acquirer was no longer serious about the transaction." (*Id.*). Thus, even though Hercules viewed the $4.5 million loan as a short-term bridge through the sales process, Hercules recognized the risk that the sale would not be completed.

Hercules incorporated OpenPeak's financial and license sale projections from Mr. Barclay's October 17 email into the Management Case section. (Tr. Ex. 48; Tr. Ex. 180 at 7). OpenPeak represented that they generated approximately $14.25 million through 3Q 2014, and projected generating an additional $17.54 million in Q4 2014 alone. (Tr. Ex. 180 at 7). Hercules incorporated OpenPeak's lower, restated June 2014 revenue into the "Management Case" of the Oct 2014 NDRM. (Tr. Ex. 180 at 7). The Oct 2014 NDRM projected that "Once the $8.0 million AT&T prepayment is absorbed (expected around October 31, 2014) the company will start to generate meaningful free cash flow." (Tr. Ex. 180 at 9). OpenPeak's projections were premised on end users at AT&T's enterprise customers activating at least 225,000 total Toggle licenses by the end of 2014. (Tr. Ex. 48; Tr. Ex. 180 at 7; Barclay Testimony). Mr. Barclay testified that even though just 335 Toggle licenses were activated by AT&T's enterprise customers, his Q4 2014 projections were reasonable because: (1) Blackberry's end users activated licenses at a similar trajectory (Tr. Ex. 180 at 5); (2) AT&T had shown the ability to activate a large number of licenses in a short period with a previous company, Mobile Iron; (3) AT&T had the ability to do a large roll-out of licenses, as it had done internally in Q1 2014 (Tr. Ex. 26 at 15); (4) AT&T's sales team was incentivized to push out the licenses and meet sales targets (Tr. Ex. 283; Tr. Ex. 26 at 3); (5) AT&T's Golden Ticket sales pipeline had led to the approval of over 2 million licenses for enterprise customers (Tr. Ex. 47 at 13); and (6) OpenPeak could meet these projections if just a few enterprise users who were already provisioned Toggle licenses activated them (Tr. Ex. 47 at 7-10). (Barclay Testimony). If the five enterprise customers that were provisioned the greatest number of Toggle licenses activated them, more

than 225,000 Toggle licenses would be activated and OpenPeak would generate revenue from AT&T in Q4. (Tr. Ex. 47 at 7-10). While Mr. Barclay's projections were aggressive, they were not necessarily unreasonable or made in bad faith.

Hercules circulated the Oct 2014 NDRM internally. (Tr. Exs. 505, 506). After reviewing the Memo, Kristan O'Connor, a portfolio credit manager at Hercules, called the Second Tranche an "[e]xcellent opportunity to get paid richly for what might well be a short term accommodation with low/medium risk given LOI. Seems like our confidence on the sale is relatively high and this is good validation for our thesis of strong [enterprise value] for debt coverage (21x)." (Tr. Ex. 505 at 2). Ms. O'Connor also cited OpenPeak's "[d]emonstrated ability to raise new equity" and the "[s]trong pipeline of license revenue" as reasons why she was in favor of loaning the Second Tranche. (*Id.*).

Ms. O'Connor also followed up on a risk cited in the Memo regarding the low end-user activations of Toggle at AT&T, asking "is this underlying fact known to the prospective buyers? If not, is this an Achilles heel to a perspective sale and/or valuation?" (*Id.*). Mr. Roesler responded to Ms. O'Connor's email that he would also "like to understand that Activation of license risk a bit better . . . with AT&T" and that he was going to call Mr. Eggbeer "to get an education on the topic." (*Id.* at 1).

In the same email, Mr. Roesler also expressed support for loaning the Second Tranche when he wrote: "I like this deal . . . I like the stickiness of both customers (AT&T / BB) . . . especially with BB activating more licenses . . . almost has a cult following." (*Id.*). Mr. Roesler went on to write that the Second Tranche provided "great return (over likely very short term) . . . only going a few million more than we put out originally and the risk profile now is much better than 18 months ago." (*Id.*).

On October 30, 2014, Hercules loaned OpenPeak the $4.5 million Second Tranche pursuant to the 2014 ARMLSA. (Pretrial Stip. at 11).

### k. *Post-Second Tranche Funding*

After Hercules funded the Second Tranche, OpenPeak worked with Synchronoss as the company conducted diligence to acquire OpenPeak. (Tr. Exs. 146, 415, 416). As Synchronoss conducted due diligence, it communicated to OpenPeak that it was "worried" about OpenPeak's "225k license 'hole'" such that "[t]hey realize that before we get 225k active licenses revenue will be zero." (Tr. Ex. 146 at 1). Thus, Synchronoss, having only conducted due diligence on OpenPeak for a short period of time by November 11, 2014, was already aware that OpenPeak's future revenue at AT&T was tied to end-user activations. (*Id.*). As of November 18, 2014, Mr. Gittleman represented to the Board of Directors at OpenPeak that he believed the transaction between OpenPeak and Synchronoss would be completed by "the last week of December 2014 and the first week of January 2015." (Tr. Ex. 416 at 2). By December 29, 2014, Synchronoss had terminated its efforts to acquire OpenPeak. (Tr. Ex. 417 at 1).

### i. "We did see this coming, you may recall . . ."

After the Synchronoss deal to acquire OpenPeak fell through, Hercules knew that its $4.5 million Second Tranche would not bridge OpenPeak through any sale, and that OpenPeak would need more funding "to make it through even the shortest of diligence cycles." (Tr. Ex. 186 at 1). OpenPeak identified another $5 million in bridge funding from another company, but Hercules believed that "the terms" that OpenPeak gave to the company were "rich (3x at sale)." (*Id.* at 1). Accordingly, Hercules believed it was "[h]ard to imagine [OpenPeak] being willing to approach" AT&T and Blackberry for additional funding on those terms because it would signify that OpenPeak is "completely over a barrel and would destroy any leverage they might have in negotiating anything down the line." (*Id.*). In light of OpenPeak's failed acquisition and

precarious financial position, Ms. Young emailed Mr. Eggbeer, Mr. Bluestein, and Mr. Roesler on January 8, 2015, writing: "We did see this coming, you may recall, when they agreed to take AT&T's investment as a prepay instead of real equity. The surprise is the slow activation that the company told us about in the fall . . . ." (Tr. Ex. 186). When AT&T decided to buy licenses from OpenPeak instead of doing an equity investment, Hercules realized that AT&T was not interested in investing in the long-term development of OpenPeak. (Young Testimony).

### ii. Durkin Report: OpenPeak's Financials are "[b]asically clean"

Hercules decided to do a field examination of OpenPeak's books and records after Synchronoss backed out of its acquisition of OpenPeak. On January 20, 2015, Mr. Roesler emailed Chris Tenaglia from the Durkin Group, copying Mr. Eggbeer, writing that Durkin's key focus points should include the "[r]amp up of pre-paid licenses being activated by AT&T." (Tr. Ex. 497a at 1). Mr. Roesler went on to write that Hercules "really want[ed] to see if forensically any funny business is going on here by taking a thorough look at the accounting (how the ledgers flow through to the fins, etc...)." (Tr. Ex. 497a at 1).

Between February 2 and February 5, 2015, the Durkin Group conducted a field examination of OpenPeak. (Tr. Ex. 192). Hercules believed that the examination conducted by the Durkin Group was the appropriate mechanism to investigate OpenPeak's books and records. The Durkin Report characterized the scope of the field examination as "a review of cash, accounts receivable, accounts payable, and financials . . . for the thirteen months ended 12/31/14." (Tr. Ex. 193 at 3). Based on this review, the Durkin Report did not find any fraud or misrepresentation in OpenPeak's books and records or with respect to its revenue recognition policies. (Tr. Ex. 193). Durkin also "reviewed the invoices to the monthly activity reports provided by the customers for monthly billing" and found that "the issued invoices were supported without exception to the customer provided activity reports." (Tr. Ex. 193 at 8). On

February 12, 2015, Mr. Roesler wrote an email to Mr. Bluestein and others stating that the Durkin Report found that OpenPeak's financials were "[b]asically clean." (Tr. Ex. 193 at 1).

### iii. No Notice of Default or Impairment of Loan

Hercules never sent OpenPeak a notice of default based on any alleged material misrepresentations or omissions, undisclosed Material Adverse Effects, or on OpenPeak's non-compliance with the Warranties, including non-compliance with GAAP. The first Notice of Default that Hercules sent to OpenPeak was on January 14, 2016, based on failure to pay principal and interest due on January 1, 2016. (Tr. Ex. 130). This was the basis for subsequent Notices of Default as well. (Tr. Exs. 135, 141).

Hercules did not impair its loan to OpenPeak in Q4 2014 or Q1 2015. (Roesler Testimony). As a public company, Hercules is required to publicly report its assessment of the probability that its loans would be repaid, and did a pro rata valuation of the loan based on the prospect of default. (*Id.*). Not impairing its loan meant that Hercules represented to the public that it believed OpenPeak would be able to repay its loan to Hercules in full. OpenPeak filed a voluntary petition for Chapter 7 bankruptcy on September 27, 2016, and Hercules filed this lawsuit against the Defendants on September 29, 2016.

### *l. GAAP Revenue Recognition*

### i. Amendment 6 Prepayment

Both Hercules and Defendants elicited expert testimony regarding whether Hercules recognized revenue from AT&T's Amendment 6 prepayment properly according to GAAP ("Generally Accepted Accounting Principles"). Hercules called P. Vincent Milano as an expert to testify about liability and about whether OpenPeak's revenue recognition policies were in accordance with GAAP. (Milano Testimony). Defendants called Patrick Gannon as an expert to

testify about the same, and also to testify about Hercules' alleged damages. (Gannon Testimony).

Both experts agreed that § 985-605 of the Financial Accounting Standards Board's codification, governing revenue recognition for software, applies to how OpenPeak should have recognized revenue pursuant to Amendment 6's sale of 225,000 Toggle licenses to AT&T for $8 million. (Tr. Ex. 368; Milano Testimony; Gannon Testimony). Specifically, both experts applied § 985-605-25-3, related to the conditions for software revenue recognition, which include: (a) persuasive evidence of an arrangement exists; (b) delivery has occurred; (c) the vendor's fee is fixed or determinable; (d) collectability is probable. (Tr. Ex. 368 at 14; Milano Testimony; Gannon Testimony). All elements must be met to recognize revenue. (*Id.*).

Gannon and Milano do not dispute that conditions (a) and (d) are satisfied. (Milano Testimony; Gannon Testimony). First, both experts agree that Amendment 6 satisfies the condition that "persuasive evidence of an arrangement exists." (*Id.*). Both experts also agree that "collectability is probable" because the $8 million was actually collected by OpenPeak from AT&T in July 2014. (*Id.*). The dispute between the experts centered on factors (b) and (c), namely, whether delivery of the software occurred, and whether the $8 million payment was fixed or determinable. (*Id.*).

With respect to whether delivery of the software occurred, in Milano's expert opinion delivery never occurred because (1) the Toggle licenses were not tangible things and therefore were never actually delivered to AT&T, and (2) OpenPeak's customer was the end user of Toggle software, not AT&T, and OpenPeak had no reason to believe they could recognize that revenue because so few end users were actually using the Toggle product. (Milano Testimony). Gannon opined that the conditions for delivery were met here pursuant to § 985-605-25-18. (Gannon Testimony). Under that section, delivery occurs "upon the transfer of the product

master" and when either "the customer has taken possession of the software via a download," or "the customer has been provided with access codes that allow the customer to take immediate possession of the software on its hardware pursuant to an agreement or purchase order for the software." (Tr. Ex. 368 at 23). Here, the "product master" for the Toggle software was delivered to AT&T some time in 2013 when AT&T first received Toggle from OpenPeak and put Toggle in the various App Stores. (Gittleman Testimony; Gannon Testimony). In addition, pursuant to Amendment 6, OpenPeak delivered the Toggle licenses to AT&T on a delivery schedule outlined in Amendment 6. (Tr. Ex. 18 at 3-4; Farmer Testimony). Finally, Gannon persuasively opined that OpenPeak's customer was AT&T, not the end user, because (1) AT&T was the entity that paid OpenPeak for the Toggle licenses and for any maintenance and support fees associated with them, (2) there were no provisions in Amendment 6 that linked AT&T's payment for the 225,000 licenses, or OpenPeak's recognition of revenue derived from them, to end-user activation or "acceptance" of the licenses, and (3) OpenPeak had no input as to what AT&T did with the licenses after the sale. (Gannon Testimony).

Next, Milano argued that the $8 million AT&T paid for the 225,000 perpetual Toggle licenses was not fixed or determinable because after Amendment 6 was executed, both AT&T and Mr. Barclay discussed refunding part of the $8 million to make OpenPeak appear more attractive to be acquired. (Milano Testimony). To support his position, Milano cited two emails in late 2014 between Mr. Barclay and AT&T where the parties considered amending Amendment 6 to give back the $8 million. (Milano Testimony; Tr. Exs. 146, 328). According to Gannon, both AT&T and OpenPeak treated the $8 million as nonrefundable because (1) Amendment 6 itself explicitly referred to "$8 million for 225,000 *nonrefundable* AT&T Toggle perpetual licenses" (Tr. Ex. 18 at 3) (emphasis added), and (2) the fact that AT&T and OpenPeak were discussing "amending" Amendment 6 to give back the $8 million meant that both AT&T

and OpenPeak believed that pursuant to Amendment 6, the $8 million was nonrefundable. (Gannon Testimony).

Having considered the testimony of both experts, I find the testimony of Gannon to be more persuasive. Hercules did not demonstrate that the manner in which OpenPeak recognized revenue derived from AT&T's $8 million payment in Amendment 6 violated GAAP.

## III.   CONCLUSIONS OF LAW AND ANALYSIS

### a.   *Negligent and Fraudulent Misrepresentation*

#### i.   Applicable Law

A plaintiff must allege four elements to establish a fraud or a fraudulent misrepresentation claim: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (citation omitted).

To establish a negligent misrepresentation claim under Florida law, a party must show: "(1) a misrepresentation of material fact that the defendant believed to be true but was in fact false; (2) that defendant should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and (4) the plaintiff acted in justifiable reliance upon the misrepresentation, resulting in injury." *Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n, Inc.*, __ So. 3d __, 2017 WL 5076915, at *2 (Fla. 1st DCA Nov. 6, 2017).

"The first elements of both causes of action require false statements of material fact." *Arlington Pebble Creek, LLC*, __ So. 3d __, 2017 WL 5076915, at *2. A fact is material if, but for the alleged nondisclosure or misrepresentation, the complaining party would not have entered

into the transaction. *Atl. Nat'l Bank of Fla. v. Vest*, 480 So. 2d 1328, 1332 (Fla. 2d DCA 1985) (internal citations omitted).

"An action for fraud generally may not be predicated on statements of opinion or promises of future action, but rather must be based on a statement concerning a past or existing fact." *Mejia v. Jurich*, 781 So. 2d 1175, 1177 (Fla. 3rd DCA 2001) (citations omitted). "Puffing" statements, such as a "promise to deliver an 'exceptional' product or service[,] [are] matter[s] of opinion rather than fact, and constitute[] non-actionable puffery." *MDVIP, Inc. v. Beber*, 222 So. 3d 555, 561 (Fla. 4th DCA 2017) (citation omitted). Financial projections have been considered non-actionable "puffing" promises of future action. *Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1103 (11th Cir. 1983) (analyzing fraudulent misrepresentation claim under Florida law).

### ii. Analysis

There is a disconnect between the claims brought in this lawsuit, the actions Hercules took at the time, and its internal contemporaneous documents and emails. The reasons for restructuring and making the loan are detailed and starkly contrast with the conclusory claims of reliance on projections and forecasts. The GAAP issues are both unconvincing and contrived and did not arise until the OpenPeak bankruptcy and the filing of the lawsuit. Hercules knew about the AT&T prepayment from the outset, none of its contemporaneous documents express concern about the way the revenue was being recognized, and even at trial its officers and employees could not explain why the reporting was not in compliance with GAAP. The GAAP issue only surfaced after the fact through Hercules' lawyers and expert and played no role in the decisions made by Hercules at the time the loans were made. While I need not definitively decide that the monthly reporting of the AT&T prepayment was GAAP compliant, I find that it was consistent with OpenPeak's reporting at the time, including the Blackberry portion of the

business, and was made after review of software revenue recognition principles and consultation of outside auditors. There was no evidence of any effort to deceive Hercules. I am not persuaded by the testimony of Hercules' expert witness that the reporting was incorrect. The AT&T prepayment was certain, non-refundable, and the software was delivered to OpenPeak's customer, AT&T.

The initial 2012 loan was made because of the previous success of Mr. Gittleman, the CEO, the presence of Board members, including the former CEO of Apple, and the promise of the Cisco tablet. When the Cisco tablet was cancelled, the major premise for the loan disappeared. OpenPeak essentially became a different company. The loan was restructured in 2014 to gain immediate fee income for Hercules and to buy more time while providing limited additional capital for OpenPeak's change in direction. The AT&T investment, success with the Blackberry relationship, and optimism about the Toggle software technology caused Hercules to stay the course.

None of the three individual Defendants made any false statements about any material facts to Hercules.

### 1.  Mr. Kwon

I question why Mr. Kwon was even sued. There is no evidence that he personally made any representation either verbally or in writing to Hercules. He did sign certain documents on behalf of OpenPeak: the 2014 AMRLSA and Advance Request (Tr. Exs. 5-7); the April 30, 2014 First and Second Amendments and Waivers to the 2014 ARMLSA (Tr. Exs. 8-9); the 3rd Amendment to the 2014 ARMLSA (Tr. Ex. 11); the Second Tranche Advance Request (Tr. Ex. 10); and compliance certificates as to monthly financials for January, March, Q1, and April, 2014. (Tr. Exs. 30, 34, 36). However, I find no statement within those documents that Mr. Kwon knew to have been false, nor any statement that Mr. Kwon should have known was false.

Hercules argues that Mr. Kwon was grossly negligent in relying upon Mr. Barclay and the OpenPeak finance department since Mr. Barclay had no prior experience as a CFO, was not a CPA, and Richards and Hronsky both left the finance department in May and June of 2014. (DE 140, Pl. Supp. Proposed Findings of Fact and Conclusions of Law, ¶ 198).

This argument is disingenuous and does not support Hercules' claims of reliance. The Hercules loan documents require the compliance certificates to be signed by either the company's CEO or CFO. When I asked why Hercules accepted and was not alarmed by compliance certificates that were signed by the company lawyer, the Hercules witnesses explained that start-up companies are often sparsely staffed and may not have a CFO. It is not credible for Hercules to argue that they could justifiably rely on financial statements prepared in the absence of a CFO or CPA but Mr. Kwon could not.

### 2. Mr. Gittleman

I likewise see no evidence of any false statement by Mr. Gittleman. With respect to Mr. Gittleman, Hercules points to the February 11, 2014 meeting with Mr. Henriquez, Mr. Bluestein, and Mr. Eggbeer; the October 9, 2014 meeting with Mr. Henriquez, and an email sent to Mr. Henriquez on September 30, 2014, asking for the October meeting. However, the Toggle sales projections, information about the "Golden Ticket" program, and AT&T sales quota passed on to Hercules before and at the February 11, 2014 meeting were received directly from AT&T. There is no indication that Mr. Gittleman doubted the AT&T data. I note that Mr. Henriquez, on the other hand, had reservations. His notes about the meeting indicated that "as incredible as that [license quota and total 2014 revenue projection] sounds, this company has yet to deliver on its many prior sales forecasts."

In asking for the October meeting, Mr. Gittleman wrote "We've really been crushing it lately, revenue has been growing through the roof and we'll have over $1.5M EBITDA in

September." Mr. Gittleman's enthusiastic optimism about OpenPeak's performance is nonactionable opinion and there is no indication that the financial information was inaccurate.

There is no evidence that Mr. Gittleman made any false representation at the October 9 meeting or that Mr. Henriquez relied upon that which was said. In recounting the meeting, Mr. Henriquez "[f]ully recogniz[ed] that Dan [Gittleman] is the constant salesman, but . . . a man with passion and religion to what he is attempting to accomplish." At the meeting, OpenPeak disclosed that the number of licenses activated was "dramatically lower" than the number sold. Mr. Henriquez saw for himself the "new applications up and running" and "more importantly i [sic] witness[ed] what a new user would experience on enabling the OpenPeak solution which was amazing." While encouraged by the meeting, Mr. Henriquez was not prepared to necessarily rely on either his own observations or the statements made: "the company has demonstrably made advances that I was not expecting to see . . . we should follow up and things appears [sic] to be progressing quite well, which all need to be confirmed and evidence supporting these claims validated." I see no basis for liability on the part of Mr. Gittleman.

### 3. Mr. Barclay

Of the three individual Defendants, Mr. Barclay had most of the contact with Hercules employees, and most of the allegations of misrepresentations are made against him. Hercules argues that Mr. Barclay made false statements which led them to enter the 2014 ARMLSA and loan the Second Tranche. Since testimony indicated that Hercules relies upon its New Deal Request Memos in deciding to make a loan, the issue turns on whether Hercules incorporated any false representation allegedly made by Mr. Barclay in either the March 2014 NDRM or the Oct 2014 NDRM.

The financial projections in the "Management Case" of the March 2014 NDRM are all derived from Mr. Barclay's financial projections for OpenPeak for FY 2014 which were based

on Toggle sales projections that Mr. Barclay directly received from AT&T. Hercules was aware that Mr. Barclay's financial projections were based on AT&T's internal sales "targets" and "forecasts." Mr. Barclay had no reason to doubt AT&T's numbers and acted reasonably in relying upon them to project OpenPeak's 2014 financial performance.

The notion that Mr. Barclay's sales forecasts are sufficient to impose liability is tenuous at best. As a general rule, statements of opinion and promises of future action such as financial projections and sales forecasts are not actionable as a matter of law. As Learned Hand said when the buyer of a machine claimed the seller had deceived him by exaggerating the machine's capabilities: "There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity." *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir. 1918). That is particularly the case with new technology companies. With no history of earnings, financial forecasts are inherently speculative; little more than guesswork. To quote Warren Buffet: "Forecasts may tell you a great deal about the forecaster; they tell you nothing about the future."

The claim that Hercules relied on Mr. Barclay's financial forecasts is untenable. In February 2014, well before the March or October 2014 New Deal Request Memos, Mr. Henriquez called the 2014 revenue forecasts "incredible" and pointed out that OpenPeak had never met any of its sales forecasts.

Mr. Barclay signed the May, June, Q2, July, August, and September 2014 compliance certificates (Tr. Exs. 37, 38, 39, 42, 50) and the 2013 Audited Financials (Tr. Ex. 50). Hercules argues that some were not in compliance with GAAP. As noted above and in the findings of fact, I conclude that Mr. Barclay believed the filings to be GAAP compliant and had no reason to believe otherwise.

47

As I see it, Hercules' only legitimate complaint is the timing of their realization that additional revenue depended upon activation of the licenses by end users. Hercules alleges that since the 225,000 prepaid licenses would need to be activated before OpenPeak generated additional sales revenue from AT&T, and just 335 licenses were activated as of October 2014, Mr. Barclay's financial projections beyond October 2014 were unreasonable and not made in good faith.

Undoubtedly, Mr. Barclay's projections were optimistic. Mr. Barclay credibly explained why he thought his projections were reasonable. Over two million licenses had been approved. AT&T had huge enterprise customers with many thousands of employees, and if only a few of those customers successfully encouraged their people to use the product, the activations would rapidly increase. He thought the Blackberry experience would be replicated.

Importantly, Hercules knew both that AT&T had prepaid for the licenses, and that activations were surprisingly low. Hercules recognized and identified as a risk in the Oct 2014 NDRM that AT&T would not continue to buy software that was not being used by its customers. Hercules knew that OpenPeak was trying to solve the problem and that Blackberry had a better activation rate. But OpenPeak itself had both low visibility and little ability to solve the problem because it was the employees of AT&T's customers who needed to affirmatively activate the software. OpenPeak could not directly control whether an AT&T customer such as Home Depot would encourage its people to use the product. It could only try to make activation easier to accomplish.

I do not see any evidence that Mr. Barclay tried to hide the problem, and Hercules understood that the low activations might be "an Achilles heel" to a prospective sale or valuation. Synchronoss was able to quickly discern the problem in its due diligence.

Unfortunately, the moment of reckoning came sooner than either OpenPeak or Hercules expected.

In any event, Hercules did not rely upon Mr. Barclay's revenue projections. Hercules made the loans based upon the "enterprise value" that OpenPeak could bring in if acquired in the future. Ultimately, Hercules sought to give itself the best opportunity to recover the funds advanced in the initial 2012 loan.

Judgment is rendered in favor of all Defendants as to Counts 1 and 4 for negligent misrepresentation and Counts 2 and 5 for fraudulent misrepresentation.

### b. *Civil Conspiracy*

The elements of a civil conspiracy are: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in furtherance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *Walters v. Blankenship,* 931 So. 2d 137, 140 (Fla. 5th DCA 2006) (citation omitted). An actionable conspiracy requires an actionable underlying tort or wrong. *Wright v. Yurko*, 446 So. 2d 1162, 1165 (Fla. 5th DCA 1984). I have determined that no Defendant is liable for negligent or fraudulent misrepresentation on any of Hercules' claims. Accordingly, there is no underlying "unlawful act" or "lawful act [done] by unlawful means" on which to base a civil conspiracy claim against any Defendant. Judgment is rendered in favor of all Defendants as to Counts 3 and 6 for civil conspiracy.

## IV. CONCLUSION

The Court finds in favor of Defendants as to all Counts asserted in Hercules' Complaint. Hercules has failed to demonstrate that any of the Defendants knew or had reason to know that any of their statements were false. Hercules also failed to prove that it relied on the alleged misstatements. Judgment is therefore rendered in favor of Defendants as to Counts 1, 2, 4, and 5.

Since Hercules has failed to establish that Defendants committed an underlying unlawful act or a lawful act done by unlawful means, Hercules' claims for civil conspiracy also fail. Thus, judgment is rendered in favor of Defendants as to Counts 3 and 6. Accordingly, it is

**ORDERED AND ADJUDGED** that final judgment is entered in favor of Defendants on all of Plaintiff's claims.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 12 day of January, 2018.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record